May it please the Court, my name is Karen Landau, and I represent Raymond Chow. I'd like to reserve four minutes for rebuttal. I'd like to focus on—the case presents several issues, but I'd like to focus on three. Hopefully we'll get that far. The first, I'd like to talk about the denial of the right to a public trial. Then, if there's time, I would like to talk about the issue of counsel and the forfeiture question. The denial of public trial. What's the second one? Counsel. The failure to relieve counsel and appoint replacement counsel. And then, finally, the forfeiture question, although I think that last one is addressed fairly well in the briefs. And, of course, I'll address any questions posed by Your Honors. So. So go to your first one and tell me why you think that Chow was denied a public trial. Okay. In this case, as the panel is aware, the judge — okay. So the principal witness against Mr. Chow, who testified for about 8 days, was an undercover agent. He was — his true identity was never revealed to the defense, and there's a separate confrontation clause about — confrontation clause argument about that. But I'd like to focus on the public trial part. In addition, while he testified, again, for a substantial portion of the trial, the judge excluded the public. And to the extent that there was a video feed, the — it's my understanding that the camera on the witness's face was either turned off or the face was blurred. The face was blurred. Yeah. I accept that. And this is a substantial exclusion of the public from a trial. The court — the reason — so what we have here is — And we have cases where we've agreed that undercover agents, when testifying, could testify with facial hair and dark glasses and other ways to show — to mask their identity. Right? Well, those — Your Honor — Yes. Okay, go ahead. I don't want to interrupt you. No. I think we have those cases. So why don't you tell me why it's constitutionally significant to have a video feed with the face blurred as opposed to having a disguised undercover agent testifying in the court? Because I'm having trouble seeing the difference. Well, I think there's several points here. First of all, the cases in which the disguise has been approved have not been cases involving the question of the denial of a right to public trial. It is a distinct constitutional point. And this is important because if a defendant is denied his right to a public trial, that is a structural error. It is not subject to harmless error analysis. That's the first point. All of those cases that — What's not public about the video being shown in the courtroom? Well, for one thing, Your Honor, the public is excluded from the trial. And that is a significant point because there's discussions — the right of a public trial accrues to the defendant. And I think that it's — Is it your position that the video was only played in a closed courtroom? Yes. Yes. And the public — and unless I'm wrong, and I'm sure the opposing counsel will correct me if I am, but the public was actually excluded from the courtroom during his testimony. Now — And there was a video feed in a different courtroom. In the overflow courtroom. In the overflow. That's right, where the press was put and — Well, I was going to say the public had a nonobstructed view of the testimony in the video feed. Well, but they didn't because his face was blurred. Well, the only thing that the public couldn't see was his face. That's correct. Of course, they also — They could hear his testimony. They could hear his words. They could hear his intonation. They could hear the rhythm of his speech. They could hear everything except they couldn't see his face. That's correct, Your Honor, but I would point out — I'm just trying to make the facts on the record as they are. They are. So I heard what Judge Bail was questioning about, and my worry was the only thing that is not make this a public trial here is that they didn't have the view of his face. That's the bottom line, isn't it? And so you want me to find that without the view of his face, there is no public trial. Your Honor, it's more than that. Again — What else? The public was excluded from the courtroom itself, the actual courtroom. But they had — just because they weren't in this courtroom, they were in the next courtroom. I mean, I was in a — But actually — I hate to tell you this. I was in the Prop 8 case. We couldn't get them all in this courtroom, but we put them in 411 other courtrooms and they all heard it all. And that's what happened here. But there's a difference, Your Honor, because the analysis, the right to public trial part of the analysis includes the concern that when a witness — that a witness is more likely to prevaricate when the public is excluded. So the concern — and I understand your point, but that constitutional concern is not satisfied. That's my point. Can I — You're suggesting that the fact that the public sees the man's testimony in an adjacent room and not physically the courtroom where the jury is seated raises a constitutional problem. I absolutely do, and it's one thing to — By absolutely, you must be very convinced of that fact. So then tell me the case that so holds. Well, I think if you — well, there's no case that so holds. Well, of course there is. There isn't a case that so holds, because this — this is a novel — I will say this is a — there is no case that is precisely like this one. So if we — if we followed you down this path, then when we have overflow of jurors and we put them in a different room, I mean — I think there's a difference between overflow and actually closing the courtroom. The point is that the public did not have access to the trial in this case. For eight days. And the — For one witness. They had access through video. That is not the same thing. I would like to make a couple — I mean — But you will agree, won't you, that prior to the closure, the court heard the objections? The court heard all the objections, made findings, made the decision as to why they did it, and put it on the record? Absolutely. And what is my standard of review, then, on that? Oh, this is de novo review, Your Honor. All right. This is a de novo review case. I would like to add something about the — But the right to a public trial is not absolute, right? It's not absolute, but to close a courtroom, there has to be an overriding interest, not just a substantial one. That's Presley v. Georgia. Well, U.S. v. Sherlock, which is the one I'm going on, trial may be partly closed if the trial judge has substantial reason. Now we're looking at that. Substantial justification, we look at that. But then the closure is narrowly tailored to exclude spectators only to the extent necessary to satisfy the purpose for which it's ordered. And then the last is, must have a hearing, must make the factual findings, must consider reasonable alternatives. Everything happens here, everything happens here except you've either got to say this wasn't a substantial justification or it wasn't narrowly tailored. And, Your Honor, I'm not saying it was not narrowly tailored. But our argument is — So then we're looking solely about substantial justification. Absolutely. And I would disagree because Yazzie says that it has to be an overriding interest and that Yazzie is post-Sherlock, U.S. v. Yazzie. I understand what this says. But regardless, regardless, I would say that there was not an overriding interest. And, you know, I am at some — So the protecting the witness from harassment and physical harm, to protect the witness in those particular situations is not a sufficient justification. That was not the justification here. The justification here was that the government had expended a lot of resources in developing this undercover agent, and I don't dispute that. That was the second one, though. I mean, there were two overriding interests, and I agree with you. You know, I tend to agree with you on that. But on the second one, which is what Judge Smith just discussed, his protection, the protection of the undercover agent. How is that not an overriding interest? If it were made out, but there was really no specific evidence about any threats. I mean, the arguments that the government made, and some of them are filed under SEAL, so I don't have them, so I'm at a disadvantage there. But, you know, the argument that Mr. Chau was a danger was really, first of all, in the sense that here his associates would pose a danger, the associates who were linked to violent acts were all in custody. And there was really no particularized evidence that he was a danger to law enforcement or that he had associates that were in custody. Kennedy, other than his admission that he had forgotten, but he had ordered a person killed. That's correct. And was convicted in the past. That was many years ago, but this is not. Many years ago, okay. But the thing is, I think you need something more than that. And the cases in which there has been similar closures involve a much stronger showing. For example, in, you know, in El Mazan, and that I think is the leading case on this point, there was, and that was, again, a confrontation clause issue, but in El Mazan you had two Israeli security agents testifying. Not only was their identities, were their identities classified, but there were, you know, the government presented evidence that Hamas sought out identities of Israeli security agents and targeted them and their families on the Internet. There was no kind of, to my knowledge, as much as I, from the record that I have, that I don't think a showing like that was made. And so I do think that this really is about, and Judge Breyer has said, you know, no disrespect to Judge Breyer, but he made, he clearly said on the record, he said this agent isn't 74. The government's expended a lot of resources on him, and, you know, I'm not going to tell the government that he can't be used because now we have, we live in a connected world, and, you know, if his face is made public, his identity will become known. But, again, he also said it was because, for fear of retaliation and violence and injury to the agents. You know, but that is, again, I would argue that the showing was insufficient, and also in this, this is the kind of, this is, if that's the case, that exists in every RICO prosecution. In every RICO prosecution we either have informants or we have undercover agents. And the point is, and the Tensor said this. I can tell you don't allege enough RICO claims. I'm sorry? I can tell you don't allege enough RICO claims. Some RICO claims are at that level, but some are just alleged because that's the best way to get to court. Well, the RICO cases that I've had, and I've had a number, as this court knows. I know. That's why I said your cases might be the way, but I'm not sure every RICO case is that way. Okay, but I hear your argument. But you see what I'm saying? I think the point is that this is the kind of argument that you can make really in any case where there's a Federal undercover agent, in any case. And the government has to show more. There has to be something specific to the case. And to the best of my knowledge, there wasn't. I would like to move on. Well, I mean, does the Court have more questions on this subject? Because no. Okay. I think we've covered it. We put the standard up there in front of you. That's what we wanted. Okay. I'd like to talk briefly about the question of counsel and the somewhat. So, and I will preface by saying, as the Court knows, I have not made a claim of ineffective assistance of counsel on direct appeal, although I would say that much of counsel's performance was dismal. I just had to say that. I don't know. I guess you had to say it. I had to say it. It doesn't really get us anywhere. You didn't argue it, so I don't know what I'm supposed to do with that. So, you know, in this case, what happened was after conviction, Mr. Chau's lawyers recognized that they had not provided effective assistance. And it's in the brief. It's in the excerpt of record. Nonetheless, despite being advised to withdraw, they did not. Did not move to withdraw. So, finally, after the motion for a new trial was denied, they did move to withdraw. And the judge relieved one of the attorneys, but refused to relieve the attorney who was clearly retained, as well as the young associate who was technically, well, appointed. He was appointed. But he was an assistant, really. So, essentially, as a result. Well, the bottom line is, let's get to the real question. If a party is deprived of counsel of choice for only a temporary period of time, post-trial, does that deprive the party of counsel in the long run? Well, I think it does. That's the question. Because there wasn't a long period of time. It was all post-trial. And they had counsel when they needed it. I mean, yes, it was counsel of choice. That makes it your best argument. I mean, you're after me because it's counsel of choice. I understand that. But it was only a temporary period of time. It was all post-trial. And I guess I'm trying to figure out what's the violation in that. Well, are you saying that is it because of the 2255? Because he wasn't allowed to file a 2250 or he wasn't allowed to file a motion for a new trial based on ineffective assistance of counsel. But we never get to the, I mean, so he doesn't file the motion for new trial. The judge tells him, essentially, wait until you're 2255. Right. And then is there ever a 2255 filed? Well, no. And, in fact, it wouldn't be filed until after the appeal. That would be the better practice. So you're saying the motion for a new trial had not been denied prior to this? No, it had been denied. I thought it had already been denied. It had been denied. So I guess there's a couple of different points here. First, I think he was deprived of counsel for a period of time. And under Yamashiro, it's clear that even, I mean, in Yamashiro, even a victim allocution at sentencing is enough to, is a deprivation of counsel. I understand your good arguments and what you've got to say, but that's why I'm carving out this situation. I'm trying to say, does this precedent that you want me to buy carve into this situation where counsel of choice was only not given for a temporary post-trial period, no motions, the motion for trial already denied, nothing happened during that time or should have happened that didn't happen, and now I'm supposed to suggest that that is automatic a problem. That's what you're arguing. And I want to know what case says that. Well, there isn't a case. This case is a, it will, there isn't a case exactly on point. I know. And that's not, and of course you know that. But I think. But you're good. You might have come up with one. I did my best. But I think the closest case is Yamashiro. I also think that a critical point here is that we have attorneys who, despite in the record knowing of their ineffective assistance of counsel, failed to move to withdraw in a timely fashion so that new counsel could be appointed. And in essence, they, he was denied, he was deprived of counsel in terms of the Sixth Amendment in connection with a critical stage of the proceeding, that being the motion for a new trial. I would like to reserve my three minutes for rebuttal if that, if the Court is, okay. Thank you.  May it please the Court. My name is Mary Jean Chan, and I represent the United States in this appeal. Chau's Sixth Amendment rights to confront witness, to a public trial, to effective assistance of counsel were all, or choice of counsel, were all vindicated. The District Court did not clearly and manifestly abuse its discretion in denying the motion for a new trial, and the forfeiture order was not plainly erroneous. I will focus just on the claims that defense counsel talked about, which was the partial disclosure of the courtroom, as well as the chosen counsel issue. But I welcome any questions that this Court, this panel has on any of the other issues. The District Court clearly complied with Sherlock in fashioning. What are you going to do with Yazzie? What I'm going to say is that that's not the right standard, because in Yazzie, there was an absolute closure. That means that in that case, the courtroom was closed entirely for the testimony of those two child witnesses. That was not the case here. As this panel already recognized in the argument, the courtroom was physically closed, but there was overflow and there was video feed, and that video feed showed the court proceedings live. There wasn't even a delay. The only thing that it didn't show was the witness's face. So as this panel recognized, the public was able to listen to the entirety of the testimony as it was happening. That does not constitute a full closure, and therefore the Sherlock standard applies. The Sherlock standard does not require an overriding interest. It requires simply a substantial interest, which there manifestly was in this case. We were talking about here the identities or the physical images of these undercover agents. And these were not just your typical undercover agents. These were undercover agents that were subject to the classified privilege. And this kind of meshes into the other argument about the right to confront witnesses, because some of the proceedings in district court on the two kind of blended in together. But there was a SIPA filing that established the classified privilege covering these undercover agents. And it makes sense. These were not agents who were engaged in just a one-time or two-week drug trafficking deal. They were the kinds of undercover agents that were involved in a three-year continuous undercover operation involving an international crime syndicate, the triads that extend beyond San Francisco, extend beyond the United States, extend into Asia. And so we have individuals who are of a higher level than your typical undercover agents. So we're not talking about something that will cover every single case involving an undercover agent. Not only do we have the classified privilege, which is a very unusual factor in this case, we have a very high level of danger that was established in this case. Again, it is not the case that in every single RICO case you have a defendant where there is such strong evidence that he ordered killings of his enemies. In this case, we have evidence that the defendant ordered the killings of Alan Wong, too, that he conspired to orchestrate the killing of Jim Tat-Kong, for which he was also convicted in this case, that he also took out previously to the facts of this case Danny Wong, that he was involved in the murder or the attempted murder on Bike Ming, that he, in fact, the trial transcript also shows that at certain points he was dissatisfied with Raymond Lay, who was a close confederate, because they wouldn't listen to him at different times, and he wanted them taken out as well. So this is a case where we have a defendant with very strong evidence that he was willing to and able to have the resources to take out those people that he thought were in his way. And certainly, the undercover agents in this case, particularly Dave Jordan or the undercover who went by Dave Jordan, was one of those people. He was somebody who... How do you respond, then, to counsel's, I thought, pretty reasonable argument, and I wish the district judge would have talked just like you did and put all that in the record. Instead, the district judge talked about, well, this is a good agent, and I don't want the agent to be not able to work forever, so I'm not going to do it. That was a totally different reason. It doesn't seem quite as sufficient as the ones you just tried to give me. Your Honor, I would think that, first of all, as I mentioned before, that the two kind of analyses blended in. So he might, the district court might not have talked about it in that particular proceeding, but it's all related. It's all related to protecting the true identities of these undercover agents and also protecting their, the dissemination, public dissemination of what they look like in the court proceeding. So I think that this court can draw upon the previous holdings with respect to the protection or the protection or withholding of the true identities of those agents. Also, a substantial reason is, for example, the classified privilege. And the fact that they would not be able to operate as undercover agents, given the kind of undercover agents that they were, given that they were subject to the classified privilege, I believe does constitute a substantial interest. I think that even without the danger aspect. See, that's the thing that I worried about, is that based on what Judge Breyer said in the district court, that I've really got to find that to be the substantial reason or I might not make it because he didn't really talk about the other interests that you brought forward. Well, Your Honor, I think that if you look at the record, especially at some of the orders that he. Well, I can see the other orders and other hearings, but I'm talking about the one he made after he did what he had to do, which was to have a hearing, must make factual findings, and then must give a reason, must look at the reasonable alternatives, doesn't seem to me. He was as clear as you might want him to be. I think that he was clear, Your Honor. I think you can draw on the other orders, but again, I think that even if this court is going to rely just on the classified privilege and the undercover agents, that that does constitute a substantial interest, particularly when you look at it in terms, in connection with how narrowly tailored this closure was. This was a partial closure. This was not a full closure. Again, the public was able to witness everything, everything that happened during the testimony of these witnesses, save for looking at their faces. And that is just a partial closure that doesn't impinge upon the defendant's right to public trial. The point about the right to a public trial is so that there is kind of a testing. You know that other people are watching, that the eyes of the public are watching. So the idea is that that will keep everybody straight in line, and it's not a secret proceeding. And there was nothing secret about this proceeding, except for the face of the witness. So I'd like to also talk about the choice of counsel claim. I would – Let me get to that. Let me ask you a question. Is it your position also that regardless whether Judge Breyer specifically mentioned the dangerousness of Chau based on the ordered killings which you've mentioned, that so long as that evidence is in the record, we should sustain his finding? Or does he have to make a finding? No, I don't think that he has to specifically talk about it in the context of this. I still go back to that this is all related. All the findings that the court made with respect to what was important about protecting the identities of these undercover agents are related. And so you can really look at that and draw upon that, even if in that specific order or in talking about that specific procedure, the court doesn't then specifically make those findings again. He does refer to it at different times. He says I'm holding this, I'm sustaining or agreeing with the government for all the reasons in the orders, including the SEPA privilege, including the SEPA filings. And so I think that the court can look to that entire record. I think that was the basis for Judge Breyer's ruling and for the fashioning of this particular remedy. But I think that also that this court can look to it. All right. You want to get to the relief of counsel issue? Yes, sure. I think that the record actually shows very clearly that Chau had fully choice of counsel. And I agree with a lot of what the court or the panel said earlier on, except for this, which is. By our questioning you mean? By your questioning, yes. The statements that were in the questioning. But what I don't agree with is the idea that he was actually deprived of counsel or choice of counsel, even during the month between June 16th when Sarah and Smith were both relieved. And this is why. Because the defendant does not have an absolute right to choice of counsel, particularly when it's appointed counsel. And this is a little bit of a complicated situation because Briggs and Smith were both appointed, even though they initially started off as retained. So when they came to the court with a motion to withdraw, the court made the correct analysis by looking at it as a conflict analysis and looking to see if anybody was conflicted. And in this, through the inquiry, through the procedure, and through the hearing on June 15th, the court determined that Chau's real concern was with Briggs. Chau claimed that Briggs had lied to him, was not communicating with him, and numerous things. And upon inquiry, Chau indicated that he didn't have a problem with Sarah, except for the fact that Briggs was in the way. Repeatedly throughout trial, throughout all the proceedings, Mr. Chau, the defendant, had said that Sarah was his trial counsel of choice. And the court had observed Sarah's performance. Sarah is a renowned defense attorney. And the district court stated that from his observation that he could not really imagine anybody who had been more prepared and had defended the defendant in a better way. So with this background and with the statements that Chau actually made at that hearing, the district court found that there was no conflict and actually that Chau didn't really want Sarah to withdraw. Chau really had a problem with Briggs. Briggs was appointed counsel because he was being paid by CHJA funds. So when the court found that there was a conflict, it then relieved Briggs and it maintained the appointment of Smith. Now, that was a perfectly appropriate thing to do because, again, through the hearing, there was no real conflict with Smith. The problem with the linchpin was. Smith was not his choice, right? It was not his choice, but he was appointed. I understand. Right. But as I understand it, Briggs was his choice, but thereafter was paid for by government funds. Yes. But once the government funds are being paid to an attorney, then that person, that attorney is converted into appointed counsel. Otherwise, you would be able to say, well, I'm just going to sort of game the system and the court is paying for it, but it's not the person I wanted and, therefore, you know, then I can convert that. So, therefore, arguments about choice of counsel, that it's their choice, goes out the window because he isn't choice anymore. He's now appointed. Is that what you're arguing? That's right. So Smith is not, doesn't, Chau is not entitled to appointed counsel of his choice. He's intended to appointed counsel. Yes. He picked Briggs. Right. And Briggs is out. So there's no question. Briggs is gone. Once he asks for him to withdraw and there is an inquiry, Briggs is gone. So the question is whether the court, by appointing Smith to continue on the case, has violated Chau's right to choice of counsel, and he has not because the court is appointing this person. Now, he may not be somebody who you would want to see on your CJA panel, depending on your criteria, but there's nothing in this case that suggests that Smith was inept or could not provide constitutionally effective assistance. In fact, we have somebody who had at this point a long history on the case. He had been in the trial. He had been the one who was primarily responsible for the post-trial motions. And he was an attorney who was on that case. And he was the one who Chau had interfaced with primarily and talked to a lot. So it was reasonable for the district court at that point to say, I'm going to keep this person on as appointed attorney.  where Chau came in and said, I want to substitute in somebody who's retained or who will provide his, right? So we're talking about him asking for appointed counsel. So that is what the district court did. The one thing the district court didn't do was to take Mr. Serra off. But again, through the inquiry, even though Chau had had his attorneys all make the request to withdraw, through that inquiry, the district court made a reasonable and not clearly erroneous finding that Chau didn't really want Serra gone. Chau, in fact, said, I really wanted Serra to be more in charge. But Briggs was in the way. But really, the only reason that's important is if, again, these attorneys who were his attorneys of choice thereafter became attorneys who are appointed. Because if there is attorneys of choice, he gets to throw them off as he wants, doesn't he? If they're retained, if they're purely retained, then yes, he can. It's not entirely unqualified. It is a little bit qualified by the timing of everything. Well, I understand. But that's why I tried to put the timing into the effect of my questioning. Yes. And I think that you're exactly right on that point. So I think that there was no deprivation of his choice of counsel at all because we're talking about really him asking for appointed counsel, and he was just simply unhappy with Smith being appointed his counsel. I'm a little bit surprised by your argument because I was really trying to get you to U.S. v. Van Ness, which suggests that violating the Sixth Amendment right to choice is subject to a harmless error analysis if it occurs only at sentencing and not at the phase of guilt. Or U.S. v. Yamashiro, which says the denial of counsel at sentencing is structural error, but the denial of counsel of choice at sentencing is not structural error. So I'm just trying to get to those cases, but you take me to a different approach. Well, I agree with those cases, and I think that absolutely it was harmless, particularly given what you had in this particular situation, which is during that single month between the time that, you know, before Dirks was able to substitute in, you really didn't have anything going on. And when Dirks came on, the only things that happened during that period of time were there were a couple of additional sort of conclusion, conclusionary post-trial motions that were filed in the sentencing memo. And when Dirks came on, he did not ask to file a new sentencing memorandum. He did not ask to file new substitute motions other than just to file a new motion for a new trial, which happened before anybody had asked to withdraw from the case. Because all of this happens well after trial and after the motion for a new trial is denied. So there's really no prejudice. It is entirely harmless. It's certainly not structural error. And for the reasons that the court has stated, even if there had been a deprivation of the choice of counsel, which I don't believe that there was, this court should deny the defendant's request for relief, which in this case would really just be to allow Dirks to file a new motion for a new trial. I know that my opposing counsel didn't get to the forfeiture argument, but if this court has a... I think you need to get to it. But I would like to say that it is not plainly erroneous. So all of this happened before Honeycutt came down. And I think it's very clear that the standard here is plain error. And this case just doesn't meet that standard, because Honeycutt talks about how there is not joint and several liability to hold an employee accountable for the proceeds that the mastermind obtains. Here we have a totally different situation. You have the mastermind at issue. It's clear from the record that Chau was the one who orchestrated the money laundering operation. He is the one who set things up with David Jordan. He is the one who was in place with David Jordan. He substituted the person first. It was George Ney and Kevin Hsu. When he was not happy with them, he put in Alan Hsu. Then when he was not happy with Alan Hsu, he substituted in Leslie Yoon and James Powell. So he was the one who controlled who was going to be operating this. And then he benefited from all that, not only by controlling the operation, but really getting a lot of money from them. Their setup was really that they had to support him entirely, all his living expenses, all his eating expenses, his entertainment expenses, his clothing. These underlings had to support him. And so the district court could find that these were the proceeds from the money laundering, the 10%, the 200. Closing, I don't buy this mastermind theory, and I have to apply Honeycutt. Then what? Well, Your Honor, what I am saying is that Honeycutt. I mean, if I apply Honeycutt, it seems to me that 853 is not very far from 1963. And therefore, this might have been an improper forfeiture. It might have been, but it's not plainly erroneous. And so the question is whether Honeycutt squarely says that when you're talking about the kingpin as opposed to the employee. Oh, but you're back to the mastermind theory. Absolutely. But if that theory doesn't work, then it seems to me you lose. Well, I think the question is whether the substantial rights of the defendant were affected. And I think that in this case, I think that the evidence does show that he did obtain directly or he obtained indirectly from the commission of the offense of conviction the money at issue. So I would argue that it doesn't meet the plain error standard because of that. The question ultimately under Honeycutt and how you read Honeycutt is you can't forfeit a defendant's property from a defendant unless you establish, and it's only by preponderance of the evidence, right, that he obtained proceeds directly or indirectly. And I think that the evidence in this case clearly shows that Chau obtained at least indirectly proceeds from the money laundering operation, which he controlled. And so I would ask this Court, for those reasons, to find that it doesn't rise to plain error. If the Court has no other questions, we would ask for an affirmance. Thank you. All right. Do you have some time for rebuttal? Thank you, Your Honor. I'd like to focus on the forfeiture issue since I didn't. So a couple of things on the forfeiture issue. First of all, this mastermind theory is based on a hypothetical in the Supreme Court's decision in Honeycutt. Honeycutt is about — Honeycutt makes clear that forfeiture is based on in-rem forfeiture, and it talks about the whole point of criminal forfeiture. The — and in this case, first of all, I don't agree that the record clearly shows that Chau wasn't in charge of the money laundering. He was charged with aiding and abetting. He was convicted on aiding and abetting and maybe a Pinkerton theory. So it's — Honeycutt is really on all fours, except that Honeycutt deals with 853, whereas this is a — And you can't make much difference between 653 — Well, I agree with you, Your Honor. And the Third Circuit has already held that Honeycutt applies to forfeitures under 1963 and 982, which were charged in this case. The Fourth Circuit has made the same finding with regard to 981. So, I mean, I think when you look at this, the weight of circuit authority clearly shows that at a minimum, this case should be remanded for the district court to address the applicability of Honeycutt. The government can make its showing then. Maybe the district court will agree, but I think — you know, but maybe they won't. Do you agree with the proposed standard of review that this is a plain error? Well, it is plain error because Honeycutt was decided in the interim between the sentencing in this case and the appeal. So it is. I have to concede that. I'm not going to — yeah. But I also would add that, you know, the district court's order was based on this court's ruling in U.S. v. Newman. Honeycutt completely eviscerates Newman. Newman is no longer good law after Honeycutt. Okay. So I have a couple other points. I doubt very much that Sherlock is good law after Georgia v. Presley. And the reason is that in Sherlock, where they talk about a substantial interest for partial closure involved excluding the defendant and family members from the trial. And Yazzie, which is post — both post-Presley — is post-Presley, clearly makes clear that a closure is — requires an overriding interest. I would — I submit that that is the standard to be applied to the closure in this case. Lastly, and I'm down to my last seconds, I would add that in this case, the judge's made with respect to concealing the defendant's identities, true identities from the defense and also defense counsel. The issue of the public trial and the reasons stated by the judge, as the court pointed out, were made and were concerned that the agent's desire to continue working, or the government's desire that the agent should be allowed to continue. And I think that that is simply not an overriding interest. With that, I will submit. Thank you very much. The court thanks counsel for their argument. And the — that being the last case on the calendar, we will be in reset. We will be adjourned until our next meeting. Thank you very much. All rise.
judges: Bea, N.R. Smith, Mãrquez